IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TRAVIS D. ROSS,

    Plaintiff,

    v.                                   Case No. 2:20-cv-02208-HLT

HUHTAMAKI, INC.,

    Defendant.

## MEMORANDUM AND ORDER

Plaintiff worked for Defendant for almost twenty years and most recently worked as a warehouse clerk. Defendant terminated his employment in February 2019 when Plaintiff returned from medical leave. Plaintiff sued, and a jury awarded Plaintiff backpay, compensatory damages, and punitive damages on Plaintiff's disability discrimination and failure to accommodate claims. The Court applied the statutory cap, so the current award is $100,000 in compensatory damages, $200,000 in punitive damages, and $83,400 in backpay for the 34 months between his termination of employment and verdict. Doc. 71.

Plaintiff now moves for $892,534.81 in front pay plus pre-judgment and post-judgment interest. Doc. 82. This amount is essentially eleven years of pay at a warehouse supervisor salary with a -3.41% discount rate. The Court agrees that front pay is appropriate but finds Plaintiff's amount to be speculative and to result in an unwarranted windfall. The Court thus awards **$98,950.47** in front pay.

**I.     BACKGROUND**[1]

Plaintiff started working for Defendant in January 2000 when he was in his thirties. Plaintiff most recently worked as a Warehouse Clerk. Jerry Modrell was the former Warehouse Supervisor and supervised Plaintiff until January 2017. Chris Schuler took over as Warehouse Supervisor when Modrell retired and supervised Plaintiff from January 2017 until Plaintiff's termination. Schuler reported to Kurt Foster. Foster was the Plant Controller. He started in that role in 2016. Kendra Yoder was the Human Resource Manager and had been in that role since 2014.

In 2015, Plaintiff began experiencing back pain and got some injections. He worked throughout 2016, but his back pain resurfaced in 2017. Plaintiff took medical leave in September 2017 to deal with his back pain and returned in October 2017. Plaintiff's back pain started again in June 2018. He took medical leave and had surgery in October 2018. He returned to work on February 9, 2019, with a 30-pound lifting restriction. Defendant terminated his employment that day. His leave from 2018-2019 included Family and Medical Leave Act ("FMLA") leave, short-term disability, and long-term disability.

Defendant made some changes to the warehouse while Defendant was on leave in 2018. The impetus and precise timing of these changes is not relevant to the instant issue. But generally Defendant split the Warehouse Supervisor position into two salaried positions (i.e., Warehouse Supervisor and Buyer) and eliminated an hourly position. Schuler moved into the Buyer position. Foster selected Matt Schurig for the Warehouse Supervisor position. Technically Defendant

---

[1] The undersigned presided over the five-day jury trial and is aware of the factual record. This background merely provides context. Additional facts are incorporated in the analysis as necessary.

eliminated an Inventory Clerk position and not the Warehouse Clerk position. But Plaintiff was the Warehouse Clerk and is the only employee who lost his job.

Plaintiff filed this lawsuit after his termination and asserted claims under the American with Disabilities Act ("ADA") and state law.[2] A jury returned a verdict in his favor on his ADA discrimination and failure to accommodate claims but returned a verdict in Defendant's favor on Plaintiff's state law claim. The jury awarded $83,400 in backpay, $100,000 for compensatory damages, and $366,800 in punitive damages. Defendant moved the Court to apply the statutory cap, and Plaintiff did not oppose. Thus, the current damages are $83,400 in backpay, $100,000 in compensatory damages, and $200,000 in punitive damages. Plaintiff now moves for an additional $892,534.81 in front pay plus pre-judgment and post-judgment interest.

## II.  ANALYSIS

The ADA incorporates the remedies available in a Title VII action. 42 U.S.C. § 12117. Those remedies include reinstatement or "any other equitable relief the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). Courts prefer reinstatement, but front pay is an alternative equitable remedy when reinstatement is not appropriate. *Hayes v. SkyWest Airlines, Inc. (Hayes II)*, 12 F.4th 1186, 1204 (10th Cir. 2021).

Reinstatement is not appropriate in this case. The parties were polite and respectful to each other during trial, but the underlying hostility and distrust was palpable. The Court finds that the termination and ensuing litigation irreparably damaged the relationship and the resumption of an amicable and productive working relationship is not feasible. There is also not an available position

---

[2] Plaintiff brings his claims under the ADA, as amended by the ADA Amendments Act of 2008. For ease of reference, the Court refers to his claims as being brought under the ADA.

3

in the warehouse that Plaintiff could fill. The parties agree that reinstatement is not appropriate. Doc. 82 at 4; Doc. 83 at 5-6. The Court thus considers front pay as an alternative equitable remedy.

Front pay compensates the victim of discrimination by helping to ensure that he "is returned as nearly as possible to the economic situation he would have enjoyed but for the defendant's illegal conduct." *Hayes II*, 12 F.4th at 1205 (internal quotation omitted). But a court "must avoid granting the plaintiff a windfall." *Id.* The award should consider "the individualized circumstances of the plaintiff and the employer." *Id.* (internal quotation omitted). Courts may consider all evidence from trial and any other evidence presented and such relevant factors as: "work life expectancy, salary and benefits at the time of termination, any potential increases in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, the period within which the plaintiff may become re-employed with reasonable efforts, and methods to discount any award to net present value." *Id.* (internal quotation omitted).

The main disputes between Plaintiff and Defendant focus on three areas: (1) whether front pay should be calculated at the Warehouse Clerk or Warehouse Supervisor rate, (2) whether the duration of the award should be for eleven years, and (3) the discount rate. The Court addresses each below.

### A.   Front Pay Should Be Calculated at the Warehouse Clerk Rate

Plaintiff contends the front pay award should be calculated at the Warehouse Supervisor rate because he would have received this promotion absent Defendant's illegal conduct. He generally cites to his performance evaluations under Modrell and Schuler, comments from two warehouse coworkers, Modrell's testimony that Plaintiff could be trained to do the Warehouse

4

Supervisor job, and his seniority in the warehouse. Doc. 82 at 5-6. Defendant disagrees and contends that Plaintiff would not have received this promotion.

Plaintiff had worked in the warehouse for almost 20 years and was a valued employee who worked hard and received generally positive performance evaluations. Modrell wrote in 2014 that Plaintiff was "a leader in the warehouse" and wrote in 2016 that Plaintiff was "a critical part" to having a smooth operation. Exs. 87, 90. And Schuler noted in 2017 that Plaintiff plays "a huge role" in coordinating everything and noted in 2018 that Plaintiff is a "versatile member of our team." Exs. 92, 95. Modrell also testified that he thought Plaintiff could be trained to do the Warehouse Supervisor job after supervising him for over fifteen years. And two warehouse coworkers made comments to Schuler about Plaintiff becoming the Warehouse Supervisor when the position opened in 2018.

But Plaintiff's argument ignores many other facts in the record. Plaintiff had been in his current role for several years and his hourly rate had not increased since 2015. *Compare* Ex. 89 *with* Ex. 95. There is no evidence that the hiring decision was based on seniority or was a lock-step promotion. He did receive positive performance evaluations but not all were flawless. Ex. 87 (noting billing errors), Ex. 95 (noting "friction" with a couple of team members). Plaintiff's coworkers told Schuler that they thought Plaintiff would be promoted when he got back. But neither coworker testified about these comments, there is no evidence that either coworker was involved in the hiring decision, and Schuler testified that he understood the coworkers to be joking. And while Modrell testified that Plaintiff could be "trained" to do the Warehouse Supervisor job, there is no evidence that Plaintiff received such training. Modrell's testimony is also limited because he retired in January 2017. Modrell, who the Court found to be a very credible witness,

also candidly admitted that he did not know how Plaintiff performed since January 2017 and did not have any knowledge about how the warehouse was restructured after January 2017.

Plaintiff also largely ignores Foster's testimony. Foster selected Schurig to fill the Warehouse Supervisor position in 2018. Foster credibly testified that he selected Schurig because Schurig had a lot of experience directly supervising people and had training and certification in 6Sigma. The record indicates that Schurig was a Production Supervisor in another division at Defendant, he had multiple years of experience in that supervisor position, and he supervised more employees in that department than he would supervise as the Warehouse Supervisor. Plaintiff, conversely, did not supervise other employees, did not write hourly evaluations for others, did not have authority to hire or fire employees, did not have authority to discipline employees, and did not have direct reports. Plaintiff does not point to such evidence, and Modrell testified that no one reported to Plaintiff. Plaintiff testified that he had 6Sigma training but, unlike Schurig, Plaintiff had not led or run 6Sigma projects.

Ultimately, the Court finds that an award based on the Warehouse Supervisor rate is too speculative and uncertain. The Court credits Foster's testimony that he selected Schurig because his supervisory experience rendered Schurig more qualified than Plaintiff and the other applicants. Foster's testimony and other evidence in the record convinces the Court that Plaintiff was good at his job as a Warehouse Clerk but would not have received this promotion regardless of Defendant's illegal conduct. The front pay award will be based on Plaintiff's Warehouse Clerk rate.[3]

Plaintiff does little to support a front pay request at the Warehouse Clerk rate and instead heavily focused on the Warehouse Supervisor rate. This is unwise. And Defendant unsurprisingly

---

[3] Although unnecessary, the Court also finds that Plaintiff's evidence of what his Warehouse Supervisor salary would have been is entirely speculative and fails to account for meaningful differences in his background and the backgrounds of Schuler and Schurig.

argues that Plaintiff waived any award based on his Warehouse Clerk pay. But the Court is mindful of the purpose of a front pay award and the wage information in the record. Plaintiff made $21.90/hour since 2015. There is no evidence that his hourly rate would be increasing. He received an additional payment at the end of the year that was about 2.75% of his fulltime wage (e.g., $21.90/hour * 40hours/week * 52weeks/year). His yearly income varied presumably due to overtime hours. His W-2 forms reflect the following social security wages: $36,269.34 in 2018, $54,698.16 in 2017, $46,726.07 in 2016, and $44,810.81 in 2015. Ex. 537. The Court averages his social security wages from 2015 to 2017 to determine a yearly rate (2018 is excluded because Plaintiff was on leave about half of the year). This yields about **$48,745/year**.

### B. The Duration of the Award Should Be Three Years

Plaintiff next contends the duration of the front pay award should be eleven years. He argues that he would have retired when he was 65 years old, which is eleven years from the verdict, that he is "very unlikely" to find another similar job given his age and lack of college degree, and that it is "very unlikely" that he will ever make more than $15,000 per year in the current work environment. He states that he has done "everything in his power" to find comparable work. Defendant again disagrees and argues that Plaintiff's request for eleven years is speculative and results in a tremendous windfall.

Plaintiff testified at trial that he intended to retire from Defendant in eleven years. He also pointed to Modrell's testimony that Modrell and two family members retired from Defendant after decades of working there. The Court finds that Plaintiff likely would have stayed at his job until his retirement. He had a good job, had been there for 20 years, had served as a Warehouse Clerk for several years, and was proficient at his job. There is no firm evidence suggesting that he was searching for other work, had indicated a desire or intent to leave Defendant for other employment,

or was otherwise unhappy at work. But Plaintiff offers little evidence other than his unadorned testimony that he intended to retire at 65 years of age and could work until then.[4] He does not identify Modrell's or his family members' age at the time of retirement or other facts rendering them similarly situated to Plaintiff. He likewise does not offer the retirement age of anyone at Defendant generally or the warehouse specifically.

But even assuming Plaintiff stayed at Defendant for eleven years does not automatically mean that a front pay award for that entire time is warranted. Front pay is an equitable remedy that recognizes that Plaintiff may be unable to move immediately into a job that his seniority or experience entitles him. Here, there is very little (if any) evidence suggesting that it would take Plaintiff an additional eleven years to find a commensurate job. Plaintiff is in his mid-50s and lacks a college degree. These facts suggest that finding comparable work may be more difficult. But they do not mean comparable work is unattainable. And Plaintiff offers little else to support his request for eleven years or support his arguments that he has done "everything in his power" to find comparable work and that it is "very unlikely" that he will find a similar job or make more than $15,000/year going forward.

Instead, the record contains substantial evidence that eleven years of front pay is speculative and results in a windfall. Plaintiff contends he has done "everything in his power" to find comparable work. But the primary evidence at trial of his efforts was an employment-search chart that covered about one month (May 13-June 16, 2019). Ex. 530. The exhibit spans multiple pages and lists several jobs (although it is unclear whether Plaintiff applied for all these jobs). The exhibit is not terribly compelling evidence of a concerted and diligent effort to find a comparable job because the chart is limited to a very short time and appears to be a form filled out for insurance.

---

[4] The state of Plaintiff's current health is a little unclear.

Plaintiff also did not describe this chart or his 2019 job search with any meaningful detail at trial. And it is undisputed that he did not apply for any jobs at Defendant in 2019 even though he was told that he was eligible for any open position and saw an opening a few months after termination.

He likewise offers <u>no</u> specific evidence about his <u>continued</u> or <u>recent</u> efforts to find comparable work. There is no evidence that he has recently been checking newspaper or online want ads, talking to friends or former colleagues about any known job openings, interfacing with a search firm, utilizing internet resources, reviewing trade journals, canvassing the industry, or submitting job applications. He contends he is eligible for a warehouse supervisor position, but there is no evidence that he applied for any of the warehouse supervisor, warehouse lead, or warehouse associate positions that Defendant identified as available in the Kansas City area. *See* Doc. 83-5. The Court further notes that several of these identified positions pay comparable wages and do not require a college degree.

The Court also finds Plaintiff's statement that it is "very unlikely" that he will find a similar job or make more than $15,000/year going forward is unsupported and speculative, particularly for a term of eleven years. Plaintiff argues that these statements are true because he has only been able to earn about $15,000/year since his termination by either driving a bus or making deliveries. Plaintiff's employment history since termination is less than clear. His 2019 W-2 indicates he earned $10,816.02 from STA[5] (driving a bus part time at $18.00/hour) and $3,687.98 from Dispatch (making deliveries). Plaintiff testified that he also earned about $3,000 that year between painting houses and driving for Uber. Documents from 2020 indicate he earned $15,376.35 from STA and earned $341.75 from Uber. He testified that he also earned money from Dispatch, Priority One, and possibly GrubHub or UberEats but could not estimate those amounts. Finally, Plaintiff

---

[5]   STA refers to STA of Missouri Inc.

9

testified that he earned about $1,817.32 from STA in 2021 before quitting that job and otherwise worked at Lab Logistics and Priority One, but he could not estimate his amount of income for those positions individually and collectively estimated $12,000 for the year. Plaintiff describes his current employment as an independent contractor for medical deliveries. But he has not provided any documentation corroborating or describing his work for Lab Logistics or Priority One in the past year.

The Court is mindful that Plaintiff is not required to accept a demotion or take a demeaning position, and the Court does not intend to nitpick his jobs since termination. Plaintiff has secured some work and has earned about $15,000/year since termination through other employment. But he has not made even a prima-facie showing that comparable work is unattainable. Instead, the record firmly undercuts his argument that it is "very unlikely" that he will find a similar job or make more than $15,000/year for the next eleven years. The Court carefully reviewed the record and observed Plaintiff's testimony at trial. His own 2019 chart and Defendant's 2022 exhibit indicate that there are comparable and available jobs, particularly now in the post-pandemic economy.[6] But there is no evidence that Plaintiff has undertaken any concerted or diligent effort to get these jobs. His search in 2019 is seemingly limited to one month and the extent of his efforts during that month is unclear. The record is silent on his current job search for comparable employment. For the work he did secure, Plaintiff left STA because he was not getting enough hours but is seemingly making less as an independent contractor. And Plaintiff's testimony about

---

[6] The 2019 chart reveals that Plaintiff was able to find 60 comparable job openings in one just month. Defendant has also presented evidence showing that there were numerous comparable job openings in the Kansas City area as of February 22, 2022. Doc. 83-5. This is consistent with the Court's understanding that there is a significant labor shortage ongoing. *See, e.g.*, Gracs Dean, *The US is in the middle of the biggest labor shortage since WW2, Goldman Sachs says*, Business Insider (Feb. 24, 2022), https://www.businessinsider.com/biggest-labor-shortage-since-ww2-goldman-sachs-workers-jobs-employment-2022-2.

his current work was very vague, generally unhelpful, not very credible, and unsupported by documentary evidence.

The Court thus finds that a front pay award for eleven years is not warranted on this record and results in a windfall. There is simply no evidence that Plaintiff would be unable to find comparable employment for eleven years. Comparable jobs exist in the economy, and it is unclear what if any steps Plaintiff is currently taking to get those jobs. There is also no evidence that Plaintiff's physical or mental health renders him unemployable. The Court finds a more reasonable front pay award is for **three years**. *See Hayes II*, 12 F.4th at 1205 (explaining that the court should specify an end date); *Townley v. Servicemaster Co., LLC*, 2017 WL 4843296, at *7 (D. Kan. 2017) (noting that determining the length of a front pay award "is a vexing task" and awarding three years).

Three years allows Plaintiff to obtain a position that pays comparable to his job at Defendant. This supplies nearly six years total to close the gap in his income when added to the 34-month backpay award. The Court also finds that the $48,745/year should be reduced by $15,000/year to account for what he is currently and demonstrably able to make. *Hayes II*, 12 F.4th at 1205 (explaining the award should account for any amounts the plaintiff could earn using reasonable efforts). The Court thus awards **$33,745** for **three years**. This amount will make Plaintiff whole but not result in a windfall.

### C.     Discount Rate

The final area of dispute is the discount rate to be applied. The parties seemingly agree on the formula to be used: $P = PMT \times ((1 - (1 / (1 + r)^n)) / r)$.[7] *See Hayes v. SkyWest Airlines, Inc.*

---

[7] In the formula, "P" equals the present value of an annuity stream, "PMT" equals the dollar amount of each annuity payment, "r" equals the discount rate, and "n" equals the number of periods in which payments will be made. If Defendant disputes this formula, it is unclear what formula it proposes.

*(Hayes I)*, 2018 WL 4561266, at *8 (D. Colo. 2018).[8] The dispute focuses on the value of "r," which is the discount rate (also known as the interest rate). Plaintiff contends that discount rate is -3.41. He calculates this number in two steps.

(1) Plaintiff calculates the federal underpayment rate, which is equal to the federal short-term interest rate plus three percent. *See* 26 U.S.C. § 6621(a)(2). The short-term federal interest rate for February 2022 is 0.59%. *See* https://www.irs.gov/pub/irs-drop/rr-22-03.pdf (last visited April 13, 2022). Adding 3% to this short-term federal interest rate yields **3.59%**.

(2) Plaintiff subtracts the present inflation rate from 3.59. Plaintiff contends the present inflation rate in the United States is 7% for December 2021 as shown in the Consumer Price Index. *See* https://www.bls.gov/charts/consumer-price-index/consumer-price-index-by-category-line-chart.htm (last visited April 13, 2022). Subtracting 7% from 3.59% yields **-3.41%**.

Defendant disagrees and contends that Plaintiff's inflation rate is exceptionally high and unlikely to persist for the duration of the award. Defendant urges the Court to simply use the average inflation rate between February 2011 and January 2022, which is 1.94% (yielding a discount rate of 1.65%).[9]

The Court agrees that Plaintiff's calculation utilizes too high of a present inflation rate. Plaintiff has not shown that the recent rise in inflation rates will persist for the next three years. The Court instead generally agrees with Defendant's approach and uses an inflation rate of 3.11%, which is the average inflation rate over the last three years (e.g., April 2019 to March 2022). *See id.* The Court also finds that the short-term federal interest rate for April 2022 is 1.26%. *See* https://www.irs.gov/applicable-federal-rates (last visited April 13, 2022).[10] Adding 3% yields

---

[8]   Plaintiff heavily relies on *Hayes I* and *Hayes II* to support his arguments. But this case is inapposite as the plaintiff in *Hayes I* and *Hayes II* had a meaningfully different factual situation.

[9]   Defendant does not seem to meaningfully disagree with Plaintiff's general methodology of calculating the discount rate by subtracting an inflation rate from the federal underpayment rate. Defendant's only disagreement is what the proper inflation rate should be.

[10]   The Court notes the parties generally used the most current numbers in the briefing. The Court likewise generally uses the most current numbers at the time of issuance.

4.26%. Subtracting the 3.11% inflation rate from 4.26% yields a discount rate of 1.15%. The resulting calculation yields a present value of $**98,950.47**.[11]

There is an additional dispute over pre-judgment interest. Plaintiff seeks pre-judgment interest from the time of termination to the date of judgment under K.S.A. § 16-201. That statute permits pre-judgment interest for "liquidated claims," which is a claim for "a known amount that has already become due." *Huffman v. Meier's Ready Mix, Inc.*, 2021 WL 219235, at *11 (Kan. Ct. App. 2021). But Plaintiff's front pay award was not a known amount and has not yet become due. *See id.* And the cases Plaintiff cites in support of pre-judgment interest address a backpay award, which is not at issue in the current motion. The Court denies the request for pre-judgment interest.[12]

## III. CONCLUSION

THE COURT THEREFORE ORDERS that Plaintiff's motion for front pay, equitable, and other relief (Doc. 82) is GRANTED IN PART. The Court awards Plaintiff **$98,950.47** in front pay.

THE COURT FURTHER ORDERS that Plaintiff shall file his motion for attorney fees on or before **April 29, 2022**. Defendant's opposition is due on or before **May 13, 2022**. Plaintiff's reply is due on or before **May 23, 2022**.

IT IS SO ORDERED.

Dated: April 13, 2022               /s/ *Holly L. Teeter*
                                    HOLLY L. TEETER
                                    UNITED STATES DISTRICT JUDGE

---

[11] The Court uses the present value of an annuity calculator that Plaintiff cites and was used by the district court in *Hayes I*. *See* UltimateCalculators.com, *Present Value of an Annuity*, https://ultimatecalculators.com/present_value_annuity_calculator.html (last visited April 13, 2022).

[12] Plaintiff also requests post-judgment interest. Post-judgment interest is automatic. *See* 28 U.S.C. § 1961(a).